IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
December 8, 2015 Session

**GERRY TALLANT v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Shelby County**
**No. 07-05423      James C. Beasley, Jr., Judge**

_____

**No. W2014-02519-CCA-R3-PC  -  Filed April 5, 2016**

_____

The petitioner, Gerry Tallant, appeals from the denial of his petition for post-conviction relief from his premeditated first degree murder conviction.  He argues that he received ineffective assistance of counsel because counsel failed to argue in the motion to suppress that: (1) he was arrested on the murder charge although the officers lacked probable cause; (2) he was detained for a custodial interrogation although the officers lacked probable cause; and (3) he was seized without reasonable suspicion.  After review, we affirm the denial of the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which THOMAS T. WOODALL, P.J., and ROBERT W. WEDEMEYER, J., joined.

Lance R. Chism, Memphis, Tennessee, for the appellant, Gerry Tallant.

Herbert H. Slatery III, Attorney General and Reporter; Jeffrey D. Zentner, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Kirby May and Stacy M. McEndree, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

A Shelby County Criminal Court jury convicted the petitioner of premeditated first degree murder, and he was sentenced to life imprisonment.  This court affirmed his conviction on direct appeal, and the Tennessee Supreme Court denied his application for permission to appeal.

This court recited the underlying facts of the case on direct appeal as follows:

On August 7, 2007, the Shelby County Grand Jury indicted the [petitioner] for the premeditated first degree murder of the victim, David Williams. The State's proof at trial revealed that the victim was dating Tracy Tallant, the [petitioner]'s daughter, and they had an eight-month old son together. The [petitioner] owned a house at 9229 Kerrville-Rosemark Road in Memphis, but he lived with his girlfriend, Tina Camplin, in Mississippi. With the [petitioner]'s permission, Tracy lived in the [petitioner]'s Memphis house. Although the victim did not have the [petitioner]'s permission to live in the house, he stayed with Tracy approximately half of every week.

On April 23, 2007, the [petitioner] and Camplin drove to Memphis, stopping first at Sanford Ruffin's apartment. At around 7:00 or 7:30 p.m., the [petitioner] drove Camplin and Ruffin to 9229 Kerrville-Rosemark Road. Camplin went to buy crack cocaine from the victim; Ruffin and the [petitioner] went to "kick [the victim's] ass" because of his ill treatment of Tracy. Camplin did not see the [petitioner] or Ruffin with a gun; however, the [petitioner] often carried a gun and had a permit to do so.

The [petitioner] parked on the street beside the residence and remained in the truck while Camplin and Ruffin went inside the residence. Camplin purchased twenty dollars' worth of crack cocaine. Ruffin stayed in the house in the bathroom, but Camplin returned to the truck.

The [petitioner] got out of the truck and went in the house; Camplin sat in the truck to use part of the crack cocaine. Within a few minutes, she heard at least five shots fired in rapid succession. A couple of minutes later, the [petitioner] returned to the truck, looking like he was "in shock." One or two shots followed, then Ruffin hurriedly returned to the truck. Afterward, they returned to Ruffin's apartment but did not talk about what happened.

Later that night, Tracy went with a friend to the Millington Police Department to ask for help getting a black man who lived with Tracy out of her residence. Tracy told police the man was possibly armed with [a] handgun and/or in possession of narcotics. Although Tracy's address was located only four or five miles from the police department, the address was in the sheriff's department's jurisdiction. Therefore, Shelby County Sergeant Glen Ray Essary, Jr., was dispatched to handle the complaint.

At approximately 9:00 p.m., Sergeant Essary and several other officers proceeded to Tracy's address. Although the residence was not well-lit, officers saw the front door had been forced open, indicating a crime had been committed. When the officers entered the residence, they saw the victim's lifeless body on the floor of the living room.

Tracy and her friend had followed police to the residence. After discovering the body and securing the scene, police placed Tracy and her friend in separate vehicles. Shelby County Deputy Charles Wallace noticed a small, .380 caliber semiautomatic handgun that was silver with a black handle in Tracy's vehicle.

Afterward, Shelby County Lieutenant John Mills and Sergeant Robert Butterick went to the residence to search for and collect evidence. In the living room, the victim "was laying face down with his head towards the front door, feet towards the kitchen area, both hands, arms up underneath him" in a "defensive" manner. There was a small, chrome, semiautomatic .380 caliber pistol in his right rear pocket. Additionally, a small bag of crack cocaine was in the "change pocket" at the top of his right front pants pocket, and a small, plastic bag containing 9.4 grams of marijuana was in [the] victim's left front pants pocket. The victim was clutching three twenty-dollar bills and two five-dollar bills in his hand.

While examining the residence, the officers noticed an ironing board in the kitchen area and a still-warm iron on the kitchen counter. There were two bullet holes in the floor: one had gouged a dent in the wood underneath the carpet and one beside the victim's head had gone completely through the floor into the foundation underneath the house.

The victim's gun was empty when it was removed from his back pocket, but there was a box of ammunition on an entertainment center in the living room. No expended shell casings were found in the house, indicating that either a revolver, which does not eject shell casings after firing, was used in the shooting or that someone using a pistol picked up the expended shell casings.

Later on the night of the homicide, police determined that the [petitioner] was a "person of interest." From a disturbance call, police determined that the [petitioner] was at Ruffin's apartment. When police went to Ruffin's apartment, they confiscated from the [petitioner] a small,

3

two-shot, .38 caliber, Davis derringer pistol and a .357 stainless steel Ruger revolver. From Ruffin, police confiscated a .40 caliber Ruger pistol, a .357 blue Smith and Wesson revolver, and a .22 caliber pump-action rifle.

On the day after the homicide, Tracy gave a statement to Shelby County Sheriff's Sergeant Kevin Helms describing the suspect as "a stocky male black, bald hair with two stud earrings and a small cream colored type truck." Sergeant Helms was familiar with an individual matching that description, but he was in custody at the time of the murder. Therefore, Sergeant Helms suspected Tracy's statement was not entirely truthful. Sergeant Helms detected no bruises or injuries on Tracy, but he noted that she was wearing baggy jeans and a sweatshirt.

Camplin also gave a statement to police, implicating Ruffin and the [petitioner] in the shooting. However, she averred that she gave the statement because she was scared, maintaining police threatened to send her to jail. Camplin stated that the victim was not the father of Tracy's baby.

The [petitioner] gave two statements to police. In his first statement, he denied any involvement in the shooting. However, after police pointed out known facts and inconsistencies in his version of events, he gave a statement implicating himself but asserting self-defense. The [petitioner] said he went to the residence to pick up a disability check. Knowing the victim was abusing Tracy, he also planned to get the victim out of the house or to find a way to stop the abuse. The [petitioner] took a chrome .357 Ruger with him. Ruffin, who had a .357 black/blue steel revolver, went along as backup. The [petitioner] walked in the house and saw a man standing there. The man "hollered" and started reaching for something; the [petitioner] became scared and fired at the man six times, emptying his gun.

Dr. Lisa Funte performed the autopsy on the victim and determined the victim's death was caused by multiple gunshot wounds, all of which were "distant gunshot wounds" made from at least a few feet away. In addition to at least three non-fatal gunshot wounds, Dr. Funte discovered three fatal wounds: one which entered the back of the victim's head; one which penetrated the victim's right lung after entering the center of his chest; and one which entered his neck, lacerated the aorta and trachea, and went through the pericardial sac covering the heart. The gunshot wounds were consistent with shots being fired in rapid succession while the victim fell. Additionally, the wound to the back of the victim's head was

4

consistent with the shooter standing over the victim as he lay face down on the floor.

Two pistols collected from the victim and Tracy at 9229 Kerrville-Rosemark Road and four handguns collected from the [petitioner] and Ruffin at Ruffin's apartment were submitted to the Tennessee Bureau of Investigation (TBI) crime laboratory for testing. Six bullets or bullet fragments discovered during the victim's autopsy were also sent to the TBI. Shelly Betts, a TBI firearms identification and ballistics expert, performed the tests. Although some of the bullets and bullet fragments "had no markings of comparison value," she determined that the bullet fired into the back of the victim's head came from Ruffin's .357 Smith and Wesson revolver. She determined the other two fatal bullets were fired from the [petitioner]'s Ruger .357 revolver. A gunshot residue test was performed on the victim's hands, but the results were inconclusive.

The defense's proof at trial was that the fifty-six-year-old [petitioner] owned the house at 9229 Kerrville-Rosemark Road, had lived there before, and stayed there every two weeks when he came to Memphis to collect his disability checks. The [petitioner] said that he "had several run-ins over the last five years" with the victim and that the victim repeatedly threatened him and his daughter over the telephone. During one of Tracy's visits in Mississippi, the [petitioner] saw a bruise on her cheek and bruises on her arms and legs.

The [petitioner] said Tracy had his permission to live in the house, but the victim did not. The [petitioner] did not always know when the victim had been in the house because he would leave upon learning the [petitioner] was coming to visit.

When the [petitioner] arrived in Memphis on April 23, 2007, he went to Ruffin's apartment. The [petitioner] said he was "[n]ot that bad [upset]" about the abuse, but he planned to get the victim out of the house. However, Camplin wanted to first buy crack cocaine from the victim. The [petitioner] explained that Camplin was unable to speak and that Ruffin knew the victim; therefore, Ruffin went along to be Camplin's "mouthpiece" during the drug purchase. Ruffin did not go to assist the [petitioner] in evicting the victim. The [petitioner] took his .357 Ruger revolver, and Ruffin had a .357 Smith and Wesson revolver.

5

At the house, the [petitioner] parked behind a two-car shed on the property because Camplin feared that the victim would leave if he saw the [petitioner], and she would not be able to get her drugs. The [petitioner] waited in the truck while Camplin and Ruffin went in to purchase drugs.

A couple of minutes later, Camplin returned to the truck, alone. The [petitioner] waited a few minutes for Ruffin then went into the house. He did not need to use his key because the front door was cracked open. The only illumination in the front of the house came from a small, fluorescent light above the sink in the kitchen.

The [petitioner] did not know Ruffin's location, but he saw the victim in the kitchen "hunkered down . . . doing something at the sink." It took the [petitioner] "a moment" to recognize the victim because he had cut his hair. The [petitioner] said nothing, but the victim noticed him a few seconds later. The victim screamed "you mother f[* * * * *] and he went for his hip," moving toward the [petitioner]. The [petitioner] believed the victim was reaching for a gun because he knew the victim carried a pistol. The [petitioner] then shot the victim. The [petitioner] fired six times, emptying his gun and hitting the victim with five of the shots, including once in the head. He acknowledged that he was an experienced shooter. He said that he was afraid and was defending himself.

The [petitioner] said that afterward he was upset, scared, and nervous. He felt sick, ran outside, and tried to vomit. After regaining his composure, he went to his truck. He began thinking he should check on the victim and got out of the truck. At that time, he heard two gunshots and saw Ruffin come out of the house. The [petitioner] and Ruffin got into the truck, and they returned to Ruffin's apartment. There was no discussion of what happened at the house.

The [petitioner] said that later that night, a man "bust[ed] in the front door" of Ruffin's apartment. When police arrived to investigate the altercation, the [petitioner] did not inform police of the shooting even though he thought the victim was dead. He admitted his first statement to police about the shooting was not truthful, but he averred that his second statement was. He conceded that he once told police that Ruffin accompanied him to "watch [his] back."

The [petitioner] acknowledged that he told Tracy that she and the baby should get out of the house before he got there, but he maintained that

6

he had not anticipated violence. The [petitioner] stated that he did not think he could "beat [the victim] up" because the [petitioner] suffered from terminal cancer and a heart condition. The [petitioner] said he wanted the victim out of the house because he abused Tracy and he was selling drugs out of the house. The [petitioner] feared he would lose the house and Tracy would lose custody of her baby if the victim were caught selling drugs from the house.

The [petitioner] acknowledged that Camplin was supposed to get the victim to come to the door, but he maintained that it was "just happenstance" he parked his truck where it could not be seen from the house. He did not know if the victim shot Ruffin or if Ruffin shot the victim.

Amber Leigh Martin and Rebecca Marie Stepp, friends of Tracy, testified that they had previously seen the victim be violent toward Tracy. Martin witnessed the victim beat Tracy. Additionally, Martin said that when Tracy stopped living with the victim and moved into a duplex, the victim broke all of the windows out of the duplex. Stepp said that on one occasion, the victim choked Tracy, stopping only when Stepp reminded him that her child and Tracy's baby were in the house. Later, the victim held Tracy's baby up by the leg and threatened to hang it.

Michelle Jones, an employee of the criminal court clerk's office, testified that the victim had a prior conviction for domestic violence. However, the offense was not committed against Tracy.

State v. Gerry Tallant, No. W2009-00585-CCA-R3-CD, 2011 WL 303216, at *1-5 (Tenn. Crim. App. Jan. 25, 2011), perm. app. denied (Tenn. May 26, 2011) (footnotes omitted).

Thereafter, the petitioner filed a timely *pro se* petition for post-conviction relief and, after the appointment of counsel, an amended petition was filed. In his petitions, the petitioner argued, among other things, that he received ineffective assistance of counsel because counsel failed to argue in the motion to suppress that: (1) he was arrested on the murder charge although the officers lacked probable cause; (2) he was detained for a custodial interrogation although the officers lacked probable cause; and (3) he was seized without reasonable suspicion. The post-conviction court conducted an evidentiary hearing over the course of five dates.

7

At the hearing, Sergeant John West of the Millington Police Department testified that on April 23, 2007, he responded to a shots-fired call at apartment three at the Hiawassee Apartments at 7636 Kiowa Street in Millington. Inside the apartment, he located two revolvers, a .22 pump-action rifle, a .40 caliber pistol, and a .38 Derringer. Sandy Ruffin claimed ownership of the revolvers and rifle, and the petitioner claimed ownership of the .40 caliber pistol and .38 Derringer. Police noticed blood on both revolvers and on the .40 caliber pistol. There was also blood on the kitchen counter where they found the .40 caliber pistol. When the police arrived, the petitioner had blood on his shirt from a recent nosebleed.

Sergeant West testified that, after investigating the shooting that happened at Mr. Ruffin's apartment, police arrested Mr. Ruffin for the shooting incident, as well as for some narcotics found in the apartment. The petitioner was not charged with anything at that point and was allowed to leave with his guns. When the officers were investigating the scene at the Hiawassee Apartments, they were not aware of an ongoing homicide investigation that the Shelby County Sheriff's Office was conducting. At some point that night after Millington police had let the petitioner go, Shelby County officers called and "asked if [Millington police officers] might be able to send a car back over to the scene to try to secure [the petitioner] for them." Shelby County officers informed them that they were investigating a homicide in the Kerrville area and that Mr. Ruffin and the petitioner were suspects.

Officer James Patricio, who was working as a patrolman with the Millington Police Department at the time of the incident, testified that on April 23, 2007, he responded to 7636 Kiowa Street to locate the petitioner, who had been deemed a person of interest in a homicide investigation. Officer Patricio observed the petitioner leaving the apartment complex in his vehicle, so both he and his partner, Officer Jerry Shelton, activated their blue lights and stopped the vehicle. Officer Patricio said that the stop was a "felony stop" to preserve officer safety because of their knowledge that the petitioner was armed.

Officer Patricio testified that he covered Officer Shelton as Officer Shelton approached the petitioner and told him to get out of the car. As the cover officer, Officer Patricio had his gun drawn and pointed at the petitioner, but Officer Shelton did not have his gun drawn. The petitioner cooperated and stepped out of his vehicle. Officer Patricio told the petitioner to turn around and placed him in handcuffs. Officer Patricio did not hear the conversation between Officer Shelton and the petitioner to know whether the petitioner was placed under arrest when he was handcuffed, but he knew that the petitioner was detained. Officer Shelton searched the petitioner after placing him in handcuffs, and the search revealed the presence of drugs. On cross-examination, Officer

8

Patricio stated that his training dictated that he handcuff a suspect for officer safety when making a stop of an individual known to be armed.

Sergeant Chris Harris of the Shelby County Sheriff's Office testified that on April 23, 2007, he became involved in the investigation of a shooting that occurred at 9229 Kerrville-Rosemark Road in Millington. Sergeant Harris arrived to the scene around 10:00 p.m. and was there for approximately twenty minutes when he was instructed to go to an apartment complex in Millington where the Millington police had the petitioner, the homeowner of the homicide scene, "stopped." When he arrived at the apartment complex, Sergeant Harris saw the petitioner in handcuffs and the officers "had some narcotics that they had located that was on the hood of the car." Sergeant Harris recalled that Sergeant Glenn Essary of the Shelby County Sheriff's Office was the one who had noticed the petitioner's connection to the two scenes because Sergeant Essary had been talking to Tracy Tallant about filing a complaint against her boyfriend who was having a dispute with an unknown African-American man.

Sergeant Harris testified that it was after he arrived to the scene at the apartment complex that he learned about what had happened there "with the shots fired and the weapons that they had recovered." Sergeant Harris recalled that the petitioner was booked into the Millington jail on the drug charge and in the early morning hours of April 24, 2007, was transported to the Shelby County Sheriff's Office to be interviewed. Sergeant Harris stated that during the first interview of the petitioner, they believed the petitioner was a witness not a suspect. Because of such, he did not advise the petitioner of his Miranda rights. After talking to Sergeant Harris, the petitioner was taken back to Millington to be housed on their charges. Sergeant Harris said that he did not make the connection between the number of bullet holes in the murder victim's body matching the number of expended rounds from two .357s found in Mr. Ruffin's apartment until after the petitioner had been stopped as he was leaving the apartment complex.

Sergeant Harris testified that he did not have any contact with the petitioner between the petitioner's first statement and second statement, four days later, in which he admitted that he shot the victim. On April 27, Sergeant Harris went to the Millington jail to talk to the petitioner after he developed more information that heightened his suspicions of the petitioner. While en route to interview the petitioner, Sergeant Harris learned that a witness, Kathy McGee, wanted to talk about what had happened at the scene of the shooting. Therefore, Sergeant Harris interviewed Ms. McGee, while Lieutenant Kevin Helms of the Shelby County Sheriff's Office began the interview of the petitioner. Sergeant Harris said that Ms. McGee's story corroborated what the police had developed through the course of investigation.

Sergeant Harris testified that, after speaking with Ms. McGee, he joined Lieutenant Helms in interviewing the petitioner. At that time, Lieutenant Helms had been talking with the petitioner for twenty to thirty minutes. The petitioner was drinking a Sprite, and it was "a casual, pleasant conversation." Sergeant Harris re-Mirandized the petitioner before taking his tape-recorded statement. Sergeant Harris recalled telling the petitioner that they believed the petitioner's daughter was involved and was subject to charge. Sergeant Harris noted that the petitioner looked fine that day, as though he were relieved to be unburdening himself by telling the truth, and seemed coherent. Sergeant Harris did not recall the petitioner's asking for any medication or saying that he needed any. Sergeant Harris described that his demeanor in talking to the petitioner was "[c]alm and laid back," and he believed Lieutenant Helms's to be the same. Sergeant Harris did not bribe or threaten the petitioner or his daughter. Sergeant Harris reiterated that the first time he spoke to the petitioner, he considered him only a witness, not a murder suspect.

Lieutenant Helms testified that on April 27, 2007, he and Sergeant Harris went to the Millington jail to interview the petitioner. Lieutenant Helms read the petitioner his Miranda rights before beginning the interview. He did not recall the petitioner's requesting any medication but did recall the petitioner talking about his terminal illness. Lieutenant Helms recalled that the petitioner looked "like he had some heavy burden on his shoulder."

Lieutenant Helms testified that the petitioner initially denied involvement in the shooting, as in his first statement. However, as the interview progressed, the petitioner began offering more truthful information, corroborating facts then known to the police. It was at that point that Sergeant Harris joined Lieutenant Helms in finishing the interview with the petitioner. When the petitioner offered to tell the truth, Lieutenant Helms and Sergeant Harris got a recording device and re-Mirandized the petitioner before taking a recorded statement.

Sergeant Glenn Essary of the Shelby County Sheriff's Office testified that around 8:00 or 9:00 p.m. on April 23, 2007, he received a dispatch call advising that a complainant, Tracy Tallant, was requesting to have a person removed from her residence at 9229 Kerrville-Rosemark in Millington. He was advised that Ms. Tallant was at the Millington Police Department, so Sergeant Essary went there to meet her. Ms. Tallant told Sergeant Essary that there had been a disturbance between her boyfriend, the victim, and another party regarding money the victim owed the other party. Ms. Tallant asked for the victim to be removed from her house because she feared for her safety and that of her children.

Sergeant Essary testified that, after speaking with Ms. Tallant, he went inside the police station to "see if there was any other information that [he] might need to be apprised of." While inside, he heard Millington police officers in the field communicating with the Millington dispatcher over the radio about a disturbance in the Millington city limits. The officers in the field were asking the dispatcher to conduct a warrant check on the petitioner. Sergeant Essary "found it kind of strange" to hear the petitioner's name on the radio while he was speaking to someone with the same last name, and he had never known anyone with that last name before. He went back to Ms. Tallant and asked about the name he had just heard, and Ms. Tallant said "that that was her dad's name but that he lived in Mississippi and was not here in Tennessee."

Sergeant Essary testified that Ms. Tallant led him and several other officers to the Kerrville address where she had lodged the complaint. Ms. Tallant told Sergeant Essary that her father, the petitioner, owned the home, but she lived there. She asked the officers to search the house for drugs and signed a consent to search form. When they got to the house, Sergeant Essary saw that the front door of the house had been kicked in. He entered the house and discovered the deceased victim on the floor. At some point, the officers on the scene started communicating with the Millington Police Department again. Sergeant Essary asked Millington police to try to locate the petitioner as a person of interest in the homicide. At that point, Sergeant Essary had no knowledge of what was going on at the other scene with the petitioner, or that the petitioner had been released from the other scene.

Sergeant Essary testified that he later heard that Millington police had located the petitioner. He said that when he put out the call to locate and detain the petitioner, he did not know that the petitioner was involved in the victim's death; all he knew was that he had just conversed with Ms. Tallant and that the petitioner owned the house where the victim was found.

On cross-examination, Sergeant Essary testified that it was routine to try to locate and talk to owners of property where homicides have occurred. On redirect examination, Sergeant Essary stated that, at the time he contacted Millington police and asked them to locate the petitioner, he did not believe there was probable cause to arrest him for the homicide but that "there was enough reasonable suspicion to have him detained as a person of interest so that the detectives could speak to him." At that point, Sergeant Essary had information that the petitioner was in Mississippi, not Tennessee, and that he was the owner of the house where a homicide took place.

Lieutenant Scott Wright of the Shelby County Sheriff's Office testified that on April 23, 2007, he worked the Kerrville-Rosemark scene where the victim was murdered. He was aware that Ms. Tallant had been at the police station and directed officers to the

murder scene. The officers were interested in finding "anybody connected to that house in any way." When he arrived on the scene, he had no reason to think that the petitioner had been involved in the homicide. He recalled speaking with Sergeant Essary, who suggested that they talk to the petitioner. Lieutenant Wright learned that Millington police had the petitioner, so he sent two detectives to talk to him. On cross-examination, Lieutenant Wright emphasized that, when a homicide victim is found in a house, it is important and routine to speak with the homeowner. Lieutenant Wright acknowledged that, at this point in the investigation, he did not believe they had probable cause to arrest the petitioner for the homicide but thought that they had reasonable suspicion to stop the petitioner based on his connection to the house.

Sergeant Raymond Sides with the Shelby County Sheriff's Office testified that he responded to the scene at 9229 Kerrville-Rosemark during the late evening hours of April 23, 2007. He spoke with Tracy Tallant at the house, who told him that the victim had gotten into an argument with another man over "a drug deal gone bad." She described the other man as bald-headed and African-American. Sergeant Sides recalled hearing the petitioner's name mentioned at the scene, but he did not have any reason to believe that the petitioner was involved in the victim's murder. He did not know why the petitioner was stopped in Millington at the request of Shelby County detectives. Sergeant Sides acknowledged that he questioned the petitioner in the early morning hours of April 24, 2007. During the interview, the petitioner was not advised of his Miranda rights as he was being interviewed only as a witness.

Officer Jerry Shelton, who worked with the Millington Police Department at the time of the offense, testified that on April 23, 2007, the Millington police had information regarding the petitioner's location when they received notification from the Shelby County Sheriff's Office that the petitioner was a person of interest in an investigation. Officer Shelton was not privy to the exact wording of Shelby County's request. Officer Shelton had, earlier, responded to the scene of Sandy Ruffin's apartment and observed another officer tell the petitioner that he was free to leave. Officer Shelton arrived to the traffic stop of the petitioner's vehicle after Officer Patricio had already pulled over the petitioner. He recalled that they "performed a high risk for a felony traffic stop and removed [the petitioner] from the vehicle and detained him." A search was conducted of the petitioner, and methamphetamine was discovered in his possession.

On cross-examination, Officer Shelton testified that the Millington dispatcher issued a general dispatch that the petitioner was to be stopped or detained. When they stopped the petitioner, they were aware that he was in possession of firearms and, therefore, the traffic stop was high risk. Officer Shelton testified that, in a high risk stop, they are trained to search the suspect in order to ensure the suspect is not armed. He acted in accordance with his training and, as a result of the search, found drugs on the

petitioner. The petitioner was arrested for drug possession but not for anything related to the request from Shelby County officers. The petitioner was booked into the Millington jail and processed for possession of methamphetamine. On redirect, Officer Shelton acknowledged that, at the time of the traffic stop, he and Officer Patricio were aware that the petitioner had a gun permit. He reiterated that he searched the petitioner for safety reasons.

The petitioner's trial counsel testified that he could not recall why, in his motion to suppress, that he failed to allege that the petitioner was arrested without probable cause on April 23, 2007, when he was driving away from Mr. Ruffin's apartment complex. Counsel surmised, "If [the issue] wasn't present maybe I wouldn't have made it. I don't have an independent recollection of that, of trying to leave it out." Counsel agreed that the issue concerning the detention was "something that [wa]s certainly plausible to raise," and that "[a]ny warrantless arrest like that you can bring as per se unreasonable so it's not unusual to raise those issues." However, counsel noted that in the motion to suppress, they alleged that there was no "probable cause or reasonable cause" to detain the petitioner relative to the first degree murder. He reiterated, "We had a suppression hearing and raised the issues that we thought we had plausibly to argue and the judge just overruled us."

Counsel recalled that the petitioner gave two statements to police. In his first statement, the petitioner denied involvement and, in his second statement, he supported and corroborated his claim of self-defense. Counsel elaborated that they did not push for suppression of the petitioner's statements too much because they thought the jury was inevitably going to find out that the petitioner was the shooter and they wanted to be able to explain. However, counsel thought that the defense "[m]aybe" would have had a better chance of getting an acquittal if the petitioner's statements had been suppressed, and he agreed that suppressing the statements would have prevented a jury from hearing inconsistencies in the petitioner's statements. Counsel was unable to say whether he would have put the petitioner on the stand to testify had the statements been suppressed. He was uncertain that suppressing the statements would have put the defense in a better position because the statements explained the petitioner's actions in case the petitioner decided not to testify. He said that they would have "had to weigh it out and see how the proof came in."

Counsel was then questioned about why he did not argue that, even if the petitioner was not arrested without probable cause, he was detained for purposes of conducting a custodial interrogation when he was stopped while leaving Mr. Ruffin's apartment complex. Counsel responded, "I know that we amended and supplemented the petition. We raised Fourth, Fifth, and Sixth Amendment grounds and we conducted a hearing. And if we left something out of it that was material, I couldn't see how that

13

would be intentional." Counsel was further questioned about why he did not argue as an additional alternative that the petitioner was stopped without reasonable suspicion when he was leaving Mr. Ruffin's apartment complex. Counsel responded, "If it's not in the record I just didn't make it. Maybe I didn't think the facts supported it. I'm just not sure."

Asked why he did not have the petitioner testify at the suppression hearing in support of his allegation that he was questioned before receiving his <u>Miranda</u> rights, counsel responded, "I rarely will call my defendant to the stand during the suppression hearing. Sometimes I do but rarely because I never know what they're going to say." Counsel could not recall whether he spoke with the petitioner about the petitioner's interaction with the police during the time period of April 23, when he was detained, through April 27, 2007, when he gave the second statement.

Counsel testified that he had practiced law for thirty-two years and had tried "[m]any, many, many, many, many" jury trials, including "a whole lot" of murder trials. He said that "[o]ne of the ancillary benefits" of a motion to suppress hearing is that "you get officers on the stand to testify so you can ask them questions and find out more what they're going to say down the road for the trial." Counsel agreed that, his having a motion to suppress hearing probably meant that he was trying to have the petitioner's statements suppressed. However, counsel said that there have been "a number of times" in his career where he has allowed his client's self-serving statement to be admitted into evidence and the petitioner's self-serving statement "was that type of statement." Counsel stated that he thought the petitioner's second statement to police mirrored his trial testimony. He thought the second statement fit with the defense's theory of the case and that it showed that the petitioner was trying to be forthcoming after initially denying involvement.

The petitioner's co-counsel testified that she could not remember what the petitioner told her about his interaction with police on the night he was arrested or from April 23 through April 27. Co-counsel could not recall the defense's specific arguments at the hearing seeking to suppress the petitioner's statements. When further pressed on why the defense did not argue that the petitioner was arrested without probable cause when he was leaving Mr. Ruffin's apartment complex on April 23, 2007, co-counsel stated:

> I'm sure we talked about okay, here's the homeowner, they're pulling him over. Where are we going at in this motion to suppress in this statement? And I'm sure we looked at that. Do I remember us doing that? No. But I know that when we have motions, that we do rely on what we've got in discovery and what our client said in order for us to make a decision about

which way we're going on it.  So do I remember us doing that?  No.  Out of habit out of the way we process things, I think we would have considered that.

Asked if the defense might have missed some of the issues it could have raised regarding the petitioner's detention, co-counsel said, "I'm thinking we would have brought out the issues we meant to bring out."  Co-counsel stated that the defense discussed the petitioner's statements and was comfortable with those statements coming into evidence regardless of the outcome of the motion to suppress.  She said that they felt comfortable enough in their defense that even if the statements were not suppressed, they were prepared to move forward.  She could not recall whether the defense would have preferred to have the statements suppressed, elaborating:

> I can't remember if this was a situation where we really wanted it.  I mean, I feel like we certainly knew we could live with it and could be that we were very comfortable.  I just don't recall.  I mean, it may have been that the suppression was offering such a good opportunity to find out some more, get a little more discovery.  I mean, that may have been a motivator behind it.  It may not have been.  It may have been we wanted to see if we could get it out and that way it's out and we could start afresh or whatever.
>
> . . . .
>
> . . . There could have been a lot of reasons why we did it and I just can't specifically recall which strategic decision was made on that.

Co-counsel testified that she did not know whether she would have encouraged the petitioner to testify had his statements to police been suppressed.  She said, "If nothing else came in to show self-defense," the defense "certainly would have wanted him more so to testify . . . [t]o fill that void."

The petitioner testified that he told counsel that he shot the victim in self-defense. He did not recall counsel's saying that they were going to try to suppress his statements to police.  He denied that either counsel or co-counsel discussed with him about testifying at the motion to suppress hearing.  The petitioner agreed that counsel asked him about his being taken into custody at the apartment complex.  He recalled giving counsel the following account:

> Ruffin fired the shots out the door up through a balcony. . . .  And the police came and they checked my weapon, gave it back to me and carried him to jail.  And then when I left they pulled me over and searched me. . . .

[T]hey found some meth on me and they arrested me and carried me to the Millington jail.

However, the petitioner acknowledged that he did not "break it down into details as far as whether they found the meth first or whether they handcuffed [him] first." The petitioner stated that co-counsel never talked to him about his interaction with police during the time period of April 23 through April 27, 2007. He said that counsel did not question him about the details of the detectives interrogating him on April 27. The petitioner testified that he would have testified at the motion to suppress hearing if counsel had advised him that it was in his best interest to do so.

The petitioner testified that when the Millington police officers arrived to Mr. Ruffin's apartment on April 23, they took him into the kitchen and unloaded his .40 caliber pistol. He told the officers he had a permit for the gun, and they gave it back to him and told him he was free to go. Subsequently, he left to go to the store, and when he pulled off in front of the next apartment complex, he saw blue lights in his rearview mirror. The petitioner pulled over and began to exit his truck, but the officer told him to stay inside. The officer walked up to the petitioner's truck, opened the driver's side door, and asked the petitioner "where [his] weapon was." The petitioner told the officer that his weapon was lying on the console. The officer asked the petitioner to get out of the truck and then walked him to the back of the truck. As they walked, the officer "kind of held [the petitioner] by the shoulder." The petitioner said that he did not feel free to leave when the officer pulled him over.

The petitioner testified that the officer asked if he had anything in his pockets the officer should know about before patting him down, and the petitioner told the officer he had methamphetamine in his pocket. The officer retrieved the methamphetamine and then handcuffed him. At that point, the officer told him he was under arrest. He did not recall whether the officer read him his Miranda rights because he was "in a state of shock," but he assumed the officer did. The petitioner was placed in a squad car and transported to the Millington jail where he was booked on a drug charge.

The petitioner claimed that, at the time of his arrest, he was suffering from a number of health problems, including cancer, high blood pressure, stress, depression, and leg pain from a prior gunshot wound to his foot. He had been without his medication for two days. He claimed that he talked to the jail staff about contacting his family to get his medications, but not at first.

The petitioner testified that, during the early morning hours of April 24, 2007, he was transported from the Millington jail to the Shelby County Sheriff's Office where he was questioned about the victim's death and gave a statement. He was not advised of his

Miranda rights before being questioned, but the officers were "real nice" during the interview and made no threats or promises. He did not think that he was in handcuffs during the statement. After he gave the officers a statement, he was transported back to the Millington jail. He allowed an officer to swab his mouth for a DNA sample.

The petitioner testified that, upon his return to the Millington jail, he was "starting to feel pretty rough." He was experiencing dizziness, headaches, and leg pain. He called his family from the Millington jail and asked them to bring his medication. The petitioner recalled that, on April 25, he slept in a small gymnasium area at the jail because it was crowded. He was fed three meals a day. By April 26, his blood pressure had become elevated, and he had not received his medications. He had not been taken to see a judge.

The petitioner testified that, on April 27, Lieutenant Helms came to the Millington jail to speak with him about the victim's death. According to the petitioner, Lieutenant Helms told him that his daughter had "been caught in a couple of lies" and threatened to arrest her. The petitioner said that he told Lieutenant Helms to "get [him] a Coke . . . and [he would] tell [him] what happened." The petitioner claimed that he had not yet been read his Miranda rights at this point. Lieutenant Helms called Sergeant Harris into the room, and the officers advised him of his rights. The petitioner gave the officers a tape-recorded statement.

The petitioner testified that he was not feeling well, but the officers were nice to him during the interview. He claimed that when he asked Lieutenant Helms about his medications, Lieutenant Helms said that he would try to get his medications after he gave a statement.

On cross-examination, the petitioner acknowledged that, when he was pulled over outside the apartment complex, the officers did not point guns at him or tell him he was under arrest. He was not handcuffed and placed under arrest until after the officer found methamphetamine in his pocket.

On redirect examination, the petitioner stated that he could not say for certain whether he was already in handcuffs when the officer retrieved the methamphetamine from his pocket. The petitioner claimed that he only gave a statement to get his medications.

Following the conclusion of the hearing, the post-conviction court entered a written order denying relief. The court found that the police had grounds to consider the petitioner a person of interest as the owner of the house where his daughter and the victim lived and where the murder took place. The petitioner was not placed under arrest or put

17

in handcuffs when they asked him to exit the car. The court found that officers had reasonable suspicion to investigate why the petitioner was in town and what he knew about the house and the killing; therefore, the stop was valid. The court further found that, because of their knowledge of the petitioner's possession of firearms from the earlier incident, it was reasonable for the officers to ask for weapons when they got the petitioner out of the car and to also ask if he had anything else on his person. The petitioner said that he had methamphetamine. The court determined that this provided probable cause to arrest the petitioner on a drug charge. The court found that the petitioner was not arrested until he turned over the drugs and that he was not arrested for the murder. The court noted that defense counsel argued that the stop, seizure, and arrest were unconstitutional and found, as it did at the suppression hearing, that the stop, seizure, and arrest were legal based on reasonable suspicion as to the homicide and then probable cause as to the drugs. The court determined that counsel adequately argued the motion to suppress, and that the proof in the case was overwhelming.

## ANALYSIS

On appeal, the petitioner argues that he received ineffective assistance of counsel because counsel failed to raise certain issues in the motion to suppress. Specifically, the petitioner asserts that counsel should have argued that he was: (1) arrested on the murder charge although the officers lacked probable cause; (2) detained for a custodial interrogation although the officers lacked probable cause; and (3) seized without reasonable suspicion.

The post-conviction petitioner bears the burden of proving his allegations by clear and convincing evidence. See Tenn. Code Ann. § 40-30-110(f). When an evidentiary hearing is held in the post-conviction setting, the findings of fact made by the court are conclusive on appeal unless the evidence preponderates against them. See Tidwell v. State, 922 S.W.2d 497, 500 (Tenn. 1996). Where appellate review involves purely factual issues, the appellate court should not reweigh or reevaluate the evidence. See Henley v. State, 960 S.W.2d 572, 578 (Tenn. 1997). However, review of a trial court's application of the law to the facts of the case is *de novo*, with no presumption of correctness. See Ruff v. State, 978 S.W.2d 95, 96 (Tenn. 1998). The issue of ineffective assistance of counsel, which presents mixed questions of fact and law, is reviewed *de novo*, with a presumption of correctness given only to the post-conviction court's findings of fact. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001); Burns v. State, 6 S.W.3d 453, 461 (Tenn. 1999).

To establish a claim of ineffective assistance of counsel, the petitioner has the burden to show both that trial counsel's performance was deficient and that counsel's deficient performance prejudiced the outcome of the proceeding. Strickland v.

Washington, 466 U.S. 668, 687 (1984); see State v. Taylor, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that same standard for determining ineffective assistance of counsel that is applied in federal cases also applies in Tennessee). The Strickland standard is a two-prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687.

The deficient performance prong of the test is satisfied by showing that "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland, 466 U.S. at 688; Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975)). Moreover, the reviewing court must indulge a strong presumption that the conduct of counsel falls within the range of reasonable professional assistance, see Strickland, 466 U.S. at 690, and may not second-guess the tactical and strategic choices made by trial counsel unless those choices were uninformed because of inadequate preparation. See Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982). The prejudice prong of the test is satisfied by showing a reasonable probability, i.e., a "probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694.

Courts need not approach the Strickland test in a specific order or even "address both components of the inquiry if the defendant makes an insufficient showing on one." Id. at 697; see also Goad, 938 S.W.2d at 370 (stating that "failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim").

Again, the petitioner argues that counsel should have raised in the motion to suppress his statements that he was: (1) arrested on the murder charge although the officers lacked probable cause; (2) detained for a custodial interrogation although the officers lacked probable cause; and (3) seized without reasonable suspicion.

The record shows that counsel in fact attempted to have the petitioner's statements suppressed based on his seizure and detention being illegal. The petitioner essentially

argues that counsel did not try hard enough, or counsel would have successfully suppressed the statements. True, counsel's argument largely focused on the Miranda issues surrounding the statements, but counsel did raise the issue of whether the seizure and detention were legal, and the trial court found no basis to suppress the statements given by the petitioner. Counsel rendered effective representation, even if imperfect.

Regardless, the arrest of the petitioner was valid; therefore, the issues the petitioner asserts that counsel should have raised would not have led to relief. The post-conviction court found that the police had reasonable suspicion to investigate why the petitioner was in town and what he knew about the killing that occurred at his house, making the stop valid. Because the officers had knowledge that the petitioner was in the possession of firearms, it was reasonable to ask for weapons and if he had anything else on his person when they had him exit his truck. The petitioner volunteered that he had methamphetamine, which then led to his arrest. Accrediting the post-conviction court's resolution of any factual discrepancies, when the petitioner was stopped, the officers did not pull guns on him, handcuff him, or say that he was under arrest. The petitioner himself testified that he was not handcuffed or placed under arrest until after the methamphetamine was recovered. The post-conviction court found that once the police discovered the methamphetamine, reasonable suspicion gave way to probable cause to make an arrest. The evidence does not preponderate against the post-conviction court's findings.

The petitioner asserts that, in the alternative, should this court find there was probable cause to arrest him, it should conclude there was no probable cause to detain him for custodial interrogation. However, as discussed earlier, the petitioner was detained with reasonable suspicion for a witness interview regarding the homicide. However, in the process of securing the petitioner for this interview, to protect their safety based on their knowledge of the petitioner's possession of guns, officers developed probable cause to arrest the petitioner on a drug charge. The same probable cause that supported the petitioner's arrest supported his detention for custodial interrogation.

In any event, even if counsel's performance was somehow deficient, we have thoroughly reviewed the testimony and evidence and conclude that the petitioner has failed to show prejudice. As the post-conviction court found, the State's proof at trial was strong. The proof showed that Tina Camplin accompanied the petitioner and Mr. Ruffin to the petitioner's daughter's house, so the petitioner and Mr. Ruffin could "kick [the victim's] ass" for mistreating the petitioner's daughter. Gerry Tallant, 2011 WL 303216, at *1. After the petitioner went inside, Ms. Camplin heard several gunshots in rapid succession and then the petitioner returned to the vehicle appearing to be "in shock." Id. Two of the fatal bullets taken from the victim matched the petitioner's revolver. Id. at *3. There was no evidence that the petitioner made any attempt to

contact police or summon aid for the victim, and he in fact failed to inform officers that he had been involved in an alleged self-defense killing when he encountered officers later that evening. There is no reasonable probability that the result of the proceeding would have been different.

## **CONCLUSION**

Based on the foregoing authorities and reasoning, we affirm the denial of the petition.

_____
ALAN E. GLENN, JUDGE